Jose Raul PAGAN TORRES, etc., et al.,
Plaintiffs, Appellants,

v.

Pedro NEGRON RAMOS, etc., et al.,
Defendants, Appellees.

No. 77-1453.

United States Court of Appeals,
First Circuit.

Argued Feb. 15, 1978.

Decided June 27, 1978.

Oswald Evan Perkins, Santurce, P.R., for plaintiffs, appellants.

Rafael Perez-Bachs, San Juan, P.R., with whom McConnell, Valdes, Kelley, Sifre, Griggs & Ruiz-Suria, San Juan, P.R., were on brief, for defendant, appellee, Ponce Mining Company.

Americo Serra, Rio Piedros, P.R., Asst. Sol. Gen., with whom Hector A. Colon Cruz, Sol. Gen., San Juan, P.R., was on brief, for defendants, appellees.

Before CAMPBELL and BOWNES, Circuit Judges, MOORE,* Senior Circuit Judge.

MOORE, Circuit Judge.

Plaintiffs appeal an order of a three-judge district court which, after receiving the response of the Supreme Court of Puerto Rico to a certified question concerning Puerto Rican sub-surface mineral rights, quashed the convocation of the court and dismissed plaintiffs' complaint as insubstantial.

The action was commenced by several farmers from the municipalities of Adjuntas and Utuado, Puerto Rico, who objected to the actions taken by co-defendant Pedro Negron Ramos, the Secretary and Director of the Natural Resources Department of the Commonwealth, in granting leases of mineral deposits to various mining companies, such as defendant Ponce Mining Co., pursuant to the Law of Mines of 1933, as amended in 1975, 28 L.P.R.A. § 111 *et seq.*, by which title to the mines and minerals was vested in the Commonwealth. Plaintiffs contended that this enactment deprived them of their property without just compensation, and that it was inconsistent with several provisions of the Civil Code of Puerto Rico, including 31 L.P.R.A. §§ 1516–1518, 4443, and 5091, which appear to recognize the rights of the individual landowners to the subsoil. The complaint also alleged that Ponce Mining Company had violated plaintiffs' rights by having acted fraudulently in regard to obtaining mining rights.

* Of the Second Circuit, sitting by designation.

A three-judge court was convened to hear the matter. After numerous motions had been addressed to the court, however, Judge Torruella, writing for the three-judge panel, concluded that the central question in the controversy involved not a question of constitutional law but an apparent conflict between the Puerto Rico statutes. The claim against Ponce Mining Company was found to be without the jurisdiction of the federal court since it concerned only allegedly fraudulent actions and depended for its resolution on whether the individual plaintiffs did, in fact, have the mineral rights in the first place. No federal question was involved, and the court concluded that, even if "pendent party jurisdiction" had survived the Supreme Court's decision in *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), under traditional pendent jurisdiction principles there was no reason for the exercise of such jurisdiction in the present case. Thus, the claim against Ponce was dismissed.

As to the claim interposed against the Governmental codefendants, Judge Torruella wrote that the answer to the constitutional claim "[depends] on the resolution of [the] apparent conflict between two statutes of the Commonwealth of Puerto Rico, the Civil Code and the Law of Mines." Since the courts of Puerto Rico had not as yet construed the interrelationship between the statutes, if any, and since resolution of the question of local property rights might avoid the need for consideration of the constitutional question, the three-judge court decided to certify the question to the Supreme Court of Puerto Rico. The question of law eventually certified was

"[w]hether pursuant to the Law of the Commonwealth of Puerto Rico, private ownership of real estate created any property rights in the subsoil minerals, which were affected by the passage of Article IA of the Law of Mines of the Commonwealth of Puerto Rico (28 LPRA 111 *et seq.*)."

On May 10, 1977, a decision was reached on the certified issue. After an extensive review and analysis of the history of Puerto Rican land ownership as it existed during Spanish control up to the time the Treaty between Spain and the United States was concluded in 1898 (Treaty of Paris, 30 Stat. 1754, T.S. 343 (1899)), the court determined that the individual landowners had never possessed the right to sub-surface minerals prior to the Treaty's passage because, under the Spanish Law of Mines of March 4, 1868, title to all mines was vested in the state. Individuals were considered only "concessionaires", never proprietors of the minerals beneath the soil, consistent with the principle that it was in the best interests of the People for natural resource policy to be set by the Government for the good of all. The mines were thus part of the "patrimony" of the citizenry of Puerto Rico at the time when the United States provided Puerto Rico with a civil government pursuant to the Organic Act of 1900, 31 Stat. 77 (Foraker Act), which provided for the continuation of laws and ordinances in force at the time of the Act (see § 8 of the Foraker Act, 31 Stat. 79), and which declared

"[t]hat all property which may have been acquired in Puerto Rico by the United States under the cession of Spain in [the] treaty of peace in any public bridges, road houses, water powers, highways, unnavigable streams . . . subterranean waters, *mines, or minerals under the surface of private lands*, and all property which at the time of the cession belonged, under the laws of Spain then in force, to the various harborworks boards of Puerto Rico, . . . is hereby placed under the control of the government established by this Act to be administered for the benefit of The People of Puerto Rico . . . ." (Foraker Act, § 13, 31 Stat. 80) (emphasis added).

Thus, according to the Supreme Court of Puerto Rico, since the Spanish Law of Mines, in effect at the time of the Treaty, had vested title to mines and minerals in the state, and since that law was continued in effect, the Government of Puerto Rico was to preserve this wealth for the benefit of the People of the Commonwealth.

The court carefully examined plaintiffs' contentions predicated on an enactment of the Puerto Rican Legislature in 1902 which eliminated certain provisions of the Spanish Civil Code and which substituted others. Although one such substituted provision seemed to have transferred mineral rights to individual landowners (giving rise to the apparent "conflict" between the Puerto Rican statutes), the court noted that the Spanish Law of Mines was never repealed, and it concluded that the legislature of 1902 *could not* have transferred mineral rights to the individual landowners, as plaintiffs claimed, because it lacked the power to give away the "patrimony" of the Commonwealth by virtue of the Treaty and the Foraker Act. *See The People v. Municipality of San Juan*, 19 P.R.R. 625, 630 (1913).

The decision of the Supreme Court of Puerto Rico followed an extensive review of the decisions and commentaries under the Spanish Civil Code and was based on the policies of the civil law of Spain, as continued in the Commonwealth of Puerto Rico. By the decision, the court determined that individual landowners did not, and never did have, any rights to the minerals beneath the lands they owned. Thus, no rights could have been affected by the passage of the Law of Mines in 1933, as amended in 1975, which, according to the court, only restated the law as it had always existed. *See Jose Raul Pagan Torres v. Secretary of Natural Resources, et al.*, No. 0–77–18 (Sup.Ct. Puerto Rico, May 10, 1977).

Plaintiffs sought to appeal this determination to the Supreme Court of the United States. Concurrently, the three-judge district court, having received the Supreme Court of Puerto Rico's decision, ordered dismissal of the complaint for want of a substantial federal question predicated on the fact that plaintiffs had no property, as defined by state law, *see Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1971), that was subject to federal constitutional protection. Since the constitutional claim was "insubstantial", *Ex parte Poresky*, 290 U.S. 30, 32, 54 S.Ct. 3, 78 L.Ed. 152 (1933); *Goosby v. Osser*, 409 U.S. 512, 518, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973),

the three-judge court ordered itself quashed for lack of jurisdiction. Plaintiffs appealed the dismissal to this court. In the interim, on January 6, 1978, the United States Supreme Court dismissed plaintiffs' appeal from the decision of the Supreme Court of Puerto Rico for "want of jurisdiction".

On this appeal, appellants' primary contention appears to be that the decision of the Supreme Court of Puerto Rico was wrong and that, because the matter involves the transfer of sovereignty, and of lands held by the sovereignties pursuant to a Treaty of the United States, the question certified to the Supreme Court of Puerto Rico was not really a question of "local law", the resolution of which should foreclose the constitutional issue raised by plaintiffs. According to appellants, contrary to the view of the Supreme Court of Puerto Rico, the rights to the sub-surface minerals in Puerto Rico were vested in the ancestors of the plaintiffs, by adverse possession, when the Treaty came into effect, and, thus, the second paragraph of article VIII of the Treaty of Paris establishes their right to the mines—a matter over which the federal courts must have the final decision.

Assuming, for the purpose of this appeal, that the dismissal of the appeal by the United States Supreme Court is no bar to further consideration, we believe that appellants misperceive the nature of the issues raised by the case under review. While it is true that the federal courts must be the final arbiters of any matter "arising under" or involving the construction of a treaty, this case does not require construction of the Treaty of Paris. The pertinent provisions of the Treaty of Paris under which appellants claim their rights are found in article VIII, which provides:

> "In conformity with the provisions of Articles I, II and III of this treaty, Spain . . . cedes in Porto Rico . . . all the buildings, wharves, barracks, forts, structures, public highways and other immovable property which, in conformity with law, belong to the public domain,

and as such belong to the Crown of Spain.

And it is hereby declared that the relinquishment or cession, as the case may be, to which the preceding paragraph refers, cannot in any respect impair the property or rights which by law belong to the peaceful possession of property of all kinds, of provinces, municipalities, public or private establishments, ecclesiastical or civic bodies, or any other associations having legal capacity to acquire and possess property in the aforesaid territories renounced or ceded, or of private individuals, of whatsoever nationality such individuals may be."

It is apparent from a reading of this provision that the matter at issue is not to be resolved by construing the Treaty itself, for article VIII is rendered meaningful only after it is determined whether property rights at issue were vested, at the time of the Treaty, in the Crown of Spain or in the individual claimants' predecessors. The rights claimed by both parties in this suit, then, must be, and were, determined by reference to the civil law in effect prior to the Treaty's passage. This is a matter of local law, and one which we think was appropriately addressed by the Supreme Court of Puerto Rico.[1]

In *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), the Supreme Court reaffirmed the principle that "state courts are the ultimate expositors of state law" and that federal courts are "bound by [state courts'] constructions except in extreme circumstances . . . ." *Id.* at 691, 95 S.Ct. at 1886. *Accord, Royal, v. Superior Court of New Hampshire, Rockingham County*, 531 F.2d 1084, 1088 n. 14 (1st Cir.), *cert. denied*, 429 U.S. 867, 97 S.Ct. 178, 50 L.Ed.2d 147 (1976). The rule is even stronger with respect to pronouncements of

the Supreme Court of Puerto Rico. In *Bonet v. Texas Co.*, 308 U.S. 463, 60 S.Ct. 349, 84 L.Ed. 401 (1940), the Supreme Court of the United States reversed a decision of this court which had reversed a ruling of the Puerto Rico Supreme Court dealing with an interpretation of local statutes. The *Bonet* court reaffirmed the principle that sound policy required federal courts to defer to the judgments of state courts on local issues unless the state decisions were "clearly wrong". *Id.* 308 U.S. at 470, 60 S.Ct. 349. Quoting Mr. Justice Holmes' observation in *Diaz v. Gonzalez*, 261 U.S. 102, 105–06, 43 S.Ct. 286, 67 L.Ed. 550 an earlier Puerto Rico case, the *Bonet* court noted:

"This is especially true in dealing with the decisions of a Court inheriting and brought up in a different system from that which prevails here. When we contemplate such a system from the outside it seems like a wall of stone, every part even with all the others, except so far as our own local education may lead us to see subordinations to which we are accustomed. But to one brought up within it, varying emphasis, tacit assumptions, unwritten practices, a thousand influences gained only from life, may give to the different parts wholly new values that logic and grammar never could have got from the books." 308 U.S. at 470 n. 17, 60 S.Ct. at 353.

The admonition was repeated in *Fornaris v. Ridge Tool Co.*, 400 U.S. 41, 42–43, 91 S.Ct. 156, 157, 27 L.Ed.2d 174 (1970), in which the Supreme Court recognized the "delicacy" of relations between the federal courts and Puerto Rico, which "is a Spanish-speaking Commonwealth with a set of laws still impregnated with the Spanish tradition. Federal courts," stated the Supreme Court, "were inclined to construe Puerto Rican

---

1. *See Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 674, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974), *quoting Wackenhut Corp. v. Aponte*, 386 U.S. 268, 87 S.Ct. 1017, 18 L.Ed.2d 37 (1967), in which the Supreme Court summarily affirmed the decision of a three-judge court for the District of Puerto Rico that had ordered abstention, stating that the courts of the Commonwealth

"should have the primary opportunity . . to determine the intended scope of its own legislation and to pass upon the validity of that legislation under its own constitution as well as under the constitution of the United States."

laws in the Anglo-Saxon tradition which often left little room for the overtones of Spanish culture. Out of that experience grew [the] pronouncement by this Court that a Puerto Rican court should not be overruled on its construction of local law unless it could be said to be 'inescapably wrong.'"

With these principles in mind, we have reviewed the comprehensive and detailed decision of the Supreme Court of Puerto Rico in the case at bar, and we are not convinced that the court's decision with respect to property rights to sub-surface minerals in the Commonwealth, well-reasoned and thorough as it is, was even arguably wrong, let alone "clearly wrong". Because that court's decision established that plaintiffs had never had any federally protectible property interests which could have been adversely affected by the Puerto Rico enactments here challenged, the three-judge court properly dismissed the complaint as insubstantial and ordered itself dissolved for lack of jurisdiction.

*Affirmed.*